IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Ernestine Lucas, | ) | C/A No. 5:10-2606-JMC-KDW |
| | ) | |
| | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Michael J. Astrue, Commissioner of | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Income Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further administrative action.

I.      Relevant Background

      A.      Procedural History

Plaintiff filed her DIB application on December 17, 2007, alleging that her disability began on November 29, 2007. (Tr. 180.) Her application was denied initially and upon reconsideration. (Tr. 107-08.) At Plaintiff's request, an Administrative Law Judge ("ALJ") held a hearing on March 25, 2009 at which Plaintiff testified. (Tr. 26-69.) At the close of that hearing, the ALJ sent Plaintiff for physical and mental consultative examinations and

informed her that he would resume her hearing and take testimony from a vocational expert ("VE") after he received the results of those examinations. (Tr. 68.) The ALJ held a second hearing on August 21, 2009, at which time he heard testimony from medical expert Milton Friedman, M.D. ("ME Friedman") and from VE Fifi Jabron. (Tr. 72-106.) The ALJ issued an unfavorable decision on September 11, 2009. (Tr. 10-25.) The Appeals Council denied Plaintiff's request for review of that decision, making it the final decision for purposes of judicial review. (Tr. 1-4.) Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on October 7, 2010. (Entry #1.)

B.     Plaintiff's Background and Medical History

1.     Background

Plaintiff is a college graduate who was 36 years old on the date of the ALJ's decision. (Tr. 29, 31.) She has past relevant work ("PRW") as a housekeeper and a human services specialist. (Tr. 23, 194.)

2.     Medical History

a.     Evidence Prior to November 29, 2007, Plaintiff's Alleged Onset-of-Disability Date

On March 21, 2007, Plaintiff reported to her treating physician, Clay Lowder, M.D. of Colonial Family Practice, that she suffered severe headaches, nerve pain, numbness in her right arm, and dizziness. (Tr. 321.) On March 27, 2007, Dr. Lowder diagnosed Plaintiff with tendonitis and carpal tunnel syndrome in her right wrist. (Tr. 319.) On April 11, 2007, Plaintiff complained to Dr. Lowder that she ached "all over" and that she had been told she had fibromyalgia. (Tr. 566.) An April 21, 2007 MRI of her neck indicated a mild central bulge at C4-5 with minimal bulges at C5-6 and C6-7 with no exiting nerve root impingement or spinal stenosis. (Tr. 488.)   In September 2007, Plaintiff reported pain and swelling in her

2

left elbow; Dr. Lowder assessed her with tennis elbow (lateral epicondylitis), prescribed pain medication, instructed Plaintiff to ice, and provided her with a tennis elbow strap. She continued to receive treatment for anemia. (Tr. 318.) On October 22, 2007, Plaintiff reported increased stress at work, anxiety, and an inability to sleep. Dr. Lowder prescribed Cymbalta and Zanax. (Tr. 316.) Later that month, Plaintiff reported that those medications helped her sleep and helped some with anxiety. She reported being a little nervous about returning to work the following day. (Tr. 315.) In November 2007, Plaintiff reported panic attacks, right wrist pain, and left elbow pain. She said taking Xanax at work made her sleepy. Dr. Lowder's assessment included panic attacks, depression, anemia, and tendonitis. He started Plaintiff on non-steroidal anti-inflammatory medication and referred her for counseling. (Tr. 312-13.) Plaintiff began counseling with licensed marriage and family therapist John Wates, Jr., on November 19, 2007. At that time, Mr. Wates assessed Plaintiff as possibly having panic attacks, anxiety, and depression; he rated her Global Assessment of Functioning ("GAF") at 55.[1] (Tr. 550-56.)

>    b. Evidence Subsequent to Plaintiff's November 29, 2007 Alleged
>       Onset-of-Disability Date

On November 29, 2007, Plaintiff went to the Palmetto Richland Memorial Hospital emergency room ("ER") and reported chest tightness, dizziness, and a syncopal episode the day before. (Tr. 298.) She told Jennifer Adair, M.D. that she experienced such symptoms when at work, but that she had never experienced the same symptoms when at home. *Id.* Dr.

---

[1] GAF ranks an individual's psychological, social, and occupational functioning on a hypothetical continuum of mental illness. As the court noted in *Parker v. Astrue*, 664 F. Supp. 2d 544 (D.S.C. 2009), "the higher a score, the greater an individual's ability to function and carry out activities of daily living." *Id.* at n.3. A GAF score of 51-61 "indicates moderate symptoms (e.g., circumstantial speech and occasional panic attacks) or moderate difficulty in social or occupational functioning (e.g., no friends, unable to keep a job)." *Id.* (*citing Diagnostic & Statistical Manual of Mental Disorders, Text Revision* (DSM-IV-TR) (2000)).

Adams observed that Plaintiff was mildly anxious, but could move her arms and legs and had a normal neurological examination. (Tr. 298-300.) Plaintiff was admitted for additional cardiac testing, which was normal. (Tr. 296.) She was discharged on November 30, 2007. (*Id.*)

On December 12, 2007, Plaintiff saw John Walsh, IV, M.D. for evaluation of her right wrist and left elbow. Dr. Walsh noted that Plaintiff had a positive Tinel sign (indicating nerve irritation) but a negative carpal tunnel compression test on the right wrist, and normal sensation, range of motion, and motor strength in both arms. He assessed her with possible carpal tunnel syndrome in her right wrist. (Tr. 400.) Subsequent nerve conduction studies and EMG (electromyography) tests were normal, however. (Tr. 410-11.) In January 2008, Dr. Walsh reviewed the tests, found no objective cause for Plaintiff's reported symptoms, and diagnosed Plaintiff with bilateral arm pain that was not caused by carpal tunnel syndrome. He opined she was at maximum medical improvement ("MMI") and had no impairment. (Tr. 534.)

Plaintiff saw Dr. Lowder on December 19, 2007, with complaints of chest pains, dizzy spells, and mood swings, but with no suicidal thoughts. (Tr. 310.) On the same day, Dr. Lowder completed a form "Physician's Statement" indicating that Plaintiff was under his care and that she had been disabled since October 22, 2007. He stated that Plaintiff remained under his care and that it was unknown when her disability would end. (Tr. 476.)

On January 7, 2008, Plaintiff saw Dr. Lowder with symptoms including body aches, bilateral arm pain, poor sleep, and dizziness. (Tr. 309.) On January 22, 2008, Plaintiff again saw Dr. Lowder with complaints of auditory and visual hallucinations, but when she returned

4

to him on January 25, 2008, she reported she had not experienced further hallucinations. (Tr. 413.)

Plaintiff continued to receive counseling from Mr. Wates in December 2007 and January 2008. (Tr. 538-39, 541, 544-45.) He wrote Dr. Lowder on January 7, 2008, and noted that Plaintiff continued to present in therapy as being easily overwhelmed and that her progress had only been fair. He recommended that Dr. Lowder arrange for Plaintiff to have a psychiatric consultation. (Tr. 540.)

On February 8, 2008, Plaintiff saw Tawana Barrow, M.D. for a psychiatric evaluation. On examination, Dr. Barrow noted Plaintiff was casually dressed, had an anxious mood and affect, and reported auditory or visual hallucinations and paranoia. She found Plaintiff was alert and oriented, with soft but non-pressured speech, goal-directed thought processes, and no suicidal or homicidal ideation. Dr. Barrow assessed Plaintiff with bipolar disorder and anxiety disorder, noted that panic disorder should be ruled out, rated her GAF at 50, and prescribed Xanax and Risperdal. (Tr. 520-25.)[2]

Plaintiff returned to Dr. Lowder on February 27 and 29, 2008 with complaints of hair loss, joint pain, and left leg pain. (Tr. 437-38.) At her February 29, 2008 visit, Plaintiff told Dr. Lowder she had begun having chest pains while waiting to see him. (Tr. 438.) Dr. Lowder felt the chest pains were likely secondary to anxiety, and noted Plaintiff had a CT scan scheduled. (*Id.*)

In March 2008, Plaintiff returned to Dr. Barrow and reported fatigue, weight gain, and paranoia, with no auditory or visual hallucinations, or suicidal or homicidal thoughts. Dr. Barrow observed that Plaintiff had a restricted mood and affect but goal-directed thoughts. She continued Plaintiff on Risperdal. (Tr. 434.)

---

[2] Dr. Barrow's handwritten treatment notes are difficult to read.

In April 2008, Plaintiff saw rheumatologist William Edwards, M.D., and reported joint pain, dizzy spells, poor sleep, and fatigue. Dr. Edwards found Plaintiff had 18 out of the 18 possible tender points used to diagnose fibromyalgia. Dr. Edwards diagnosed Plaintiff with multifactorial chronic pain with severe emotional issues and recommended non-narcotic pain medication. (Tr. 497-500.)

In June 2008, Dr. Lowder wrote a letter addressed "To Whom It May Concern," and stated that Plaintiff had tennis elbow, which he described as very painful. He did not identify any specific functional limitations. (Tr. 565.)

On June 6, 2008, Plaintiff saw orthopedist David Woodbury, M.D. for evaluation of right wrist pain. Plaintiff told Dr. Woodbury she had not worked for two months, but that her right wrist pain had not improved. On examination, Dr. Woodbury found Plaintiff was alert and oriented, with a normal mood, pleasant affect, and normal neurological examination. Dr. Woodbury observed that wrist x-rays and EMG testing were normal. He was not able to identify an anatomical basis for her reported symptoms, but noted possible "secondary gain issues." He prescribed a short course of occupational therapy and non-narcotic pain medication. (Tr. 564-65.)

In August 2008, Plaintiff returned to Dr. Lowder and reported worsening bilateral elbow, wrist, and shoulder pain. She said her children had to help her dress and shift gears in the car. Dr. Lowder assessed her with forearm tendonitis and tennis elbow in her right arm. (Tr. 578.)

In September 2008, Plaintiff told Dr. Lowder that she was experiencing dizzy spells (especially when walking), left arm pain, and right elbow pain. Dr. Lowder's assessment included anemia and tennis elbow. (Tr. 577.) Later that month, Plaintiff reported dizziness

throughout the day, and stated that she had recently gone off the road while driving. Dr. Lowder noted that he would not prescribe insomnia medication because it could cause drowsiness. (Tr. 575.)

Also in September 2008, Plaintiff returned to Dr. Barrow and said she had been out of medication for two months. She reported racing thoughts, stress, and difficulty sleeping. Dr. Barrow observed that Plaintiff was casually dressed, with a restricted mood and affect and some paranoia, and was alert and oriented, with goal-directed thoughts and no hallucinations or suicidal ideation. (Tr. 568.)

Because of Plaintiff's dizziness, she had an MRI taken of her brain in October 2008. The MRI was unremarkable and did not show any acute intracranial abnormality or mass. (Tr. 590.)

In November 2008, Plaintiff told Dr. Lowder that she was experiencing left elbow pain, right wrist pain, bilateral shoulder pain, insomnia, migraines, and dizzy spells. Dr. Lowder noted that Plaintiff was anemic. (Tr. 574.) She again saw Dr. Lowder on November 21, 2008 and reported pain in both arms and in her right leg. Duplex venous scanning showed superficial venous thrombosis in her right calf, but was negative for deep vein thrombosis. Dr. Lowder continued to treat her for anemia. (Tr. 573, 581-82.)

On November 4, 2008, Plaintiff told Dr. Barrow she was not much better, reporting poor sleep, scattered thoughts, and low energy. She said she had not been taking her medication for financial reasons. Dr. Barrow noted that Plaintiff was neatly dressed and had a restricted mood and affect and some paranoia, but was alert and oriented, with goal-directed thoughts and no hallucinations or suicidal ideation. She restarted Plaintiff on medications and emphasized to Plaintiff the need to continue taking them. (Tr. 567.)

On November 4, 2008, Dr. Barrow completed a Mental Residual Functional Capacity Questionnaire (Mental), opining that Plaintiff had "extreme" limitations in her ability to understand, remember, and carry out both simple and complex instructions, respond appropriately to changes in the work setting, and respond to customary work pressures; and "marked" limitations in the ability to interact appropriately with the general public, ask simple questions or request assistance, maintain personal habits, perform daily activities, understand, remember, and carry out repetitive tasks, maintain attention and concentration for less than two hours at a time, sustain a routine without special supervision, make simple work-related decisions, respond appropriately to supervisors and co-workers, and be aware of normal hazards and take normal precautions. Dr. Barrow opined that Plaintiff would likely miss more than four days of work per month, and could never complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. Dr. Barrow opined that Plaintiff's limitations would last more than 12 months, but offered no opinion regarding when the limitations first rose to the severity level reflected in the opinion. (Tr. 69-71.)

Plaintiff saw Dr. Barrow on January 30, 2009, noting that she "had a lot on her," including health issues and stress in her marriage. Dr. Barrow observed that Plaintiff was neatly dressed, with some paranoia, but noted Plaintiff had goal-directed thoughts and no hallucinations or suicidal ideation. (Tr. 592.)

At Plaintiff's March 25, 2009 administrative hearing, the ALJ ordered she have an internal and psychological evaluation. (Tr. 68.) At the ALJ's request, Plaintiff saw Douglas Ritz, Ph.D. for the psychological evaluation. (Tr. 594-600.) Plaintiff first saw Dr. Ritz on

May 12, 2009, and reported hearing voices day and night, and said she sometimes did not sleep for one or two days at a time. Plaintiff said that her house burned down in February 2009, exacerbating her bipolar disorder. She asked to end the exam because of chest pain. (Tr. 594-97.) Plaintiff was scheduled to complete the evaluation the following week.

On May 19, 2009, Dr. Barrow saw Plaintiff for an unscheduled appointment. Dr. Barrow found Plaintiff had suicidal ideation with a "clear plan," and referred her for hospitalization. (Tr. 662.)

Also on May 19, 2009, Plaintiff was voluntarily hospitalized at Three Rivers Behavioral Health because of psychotic symptoms, including auditory and visual hallucinations and suicidal ideation. Her GAF on admission was rated at 35. (Tr. 595, 602, 605-11.) At the time of her discharge the following week, Plaintiff was alert and oriented, with a bright affect and hallucinations or suicidal ideation. Cheryl Dodds, M.D., assessed her with bipolar disorder and rated her GAF at 65. (Tr. 601-04.)

In June 2009, Dr. Barrow noted that Plaintiff's medications were adjusted during her stay at Three Rivers. Plaintiff reported that she was doing better on the new medication, stating she did not feel tired all the time, slept better, and felt less stress. Plaintiff also reported that she learned some coping skills during her stay at Three Rivers. She was neatly dressed, with a restricted mood and affect but goal-directed thoughts and no hallucinations or suicidal ideation. (Tr. 661.)

On June 29, 2009, Plaintiff saw Dr. Lowder and reported symptoms including fatigue and dizzy spells. Dr. Lowder noted that a CT scan of her head had been negative. He continued to treat her for anemia. (Tr. 653.) X-rays of Plaintiff's lower back showed no

abnormalities other than a "mild gentle leftward scoliosis," and x-rays of her right wrist were normal. (Tr. 649-50.)

Also in June 2009, Plaintiff returned to Dr. Ritz to complete her psychological evaluation. She reported that she was unable to afford medication. Plaintiff said that, during a typical day, she woke up at 6:30 a.m., got her children (ages 9, 12, and 16) off to school, prepared her own breakfast, read (although she reportedly experienced difficulty focusing), and, depending on her level of pain, did laundry and cleaning. Plaintiff performed her own personal care, visited with her sister, and attended church. On examination, she was alert, oriented, responsive, and generally attentive. Dr. Ritz assessed her with bipolar disorder and rated her GAF at 60. He opined she could handle a work-related setting and perform simple tasks and responsibilities. (Tr. 594-600.)

On July 14, 2009, Plaintiff saw Eric Byrd, M.D., for a physical examination. She reported pain in her shoulder, elbow, arm, neck, lower back, and joint pain; vertigo (daily); migraine headaches (weekly); anemia; and bipolar disorder. Plaintiff said she was "capable of most activities of daily living except when her elbows [we]re very painful." She could drive a car. On examination, Plaintiff was alert and oriented and did not appear outwardly depressed. She had difficulty getting on and off the examination table and stood frequently from a sitting position (reporting lower back pain), but walked normally without assistance and moved around the examination room well, with no evidence of loss of balance or instability. Although Plaintiff reported pain with straight leg raising, Dr. Byrd observed that she could lift her legs off the examination table without difficulty. She demonstrated some limitations in lifting her arms overhead, but Dr. Byrd observed that she did not appear to be giving full effort on range of motion testing of her arms. Plaintiff exhibited pain with

palpation of 16 out of 18 possible tender points and reported pain with bending and twisting at the waist, but had full range of motion in her neck (with reported pain but with no apparent difficulty) and joints. She did not have any muscular atrophy or joint swelling. Dr. Byrd's assessment included vertigo, bilateral tennis elbow, polyarthralgias, history of migraine headaches, history of iron deficiency anemia, and bipolar disorder. (Tr. 639-42.)

Also on July 14, 2009, Dr. Byrd completed a Medical Source Stating of Ability to Do Work-Related Activities, indicating that Plaintiff could not lift five pounds or more, noting her report that she was unable to lift a bag of sugar. He further opined she could sit for a total of only 15 minutes and stand for a total of only 10 minutes in an eight-hour day, adding that Plaintiff told him she was unsure how long she could stand in an eight-hour day. (Tr. 639-48.)

In August 2009, Plaintiff returned to Dr. Barrow and reported depression and fatigue. On examination, she was alert, oriented, and neatly dressed, with a restricted mood and affect but goal-directed thoughts and no hallucinations or suicidal ideation. (Tr. 659.)

During the administrative proceedings, state agency doctors Richard Weymouth and Ellen Humphries reviewed the record and opined that Plaintiff did not have severe physical impairments. (Tr. 107, 414, 501.) State agency psychologist Manhal Wieland reviewed the record and opined Plaintiff had a severe mental impairment. (Tr. 501.) Dr. Wieland completed a Psychiatric Review Technique Form ("PRTF") and opined that, although Plaintiff had the severe mental impairments of depression, as well as bipolar, anxiety, and panic disorders, "her mental condition would not preclude her from performing simple tasks, in a work setting with minimal work with the general public." (Tr. 502-18, 514.)

State agency psychologist Edward Waller also reviewed the record and completed a PRTF. (Tr. 415-31.) Dr. Waller opined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed at 20 C.F.R. pt. 404, subpt. P, app. 1, and that she retained the mental residual functional capacity ("RFC") to perform a range of unskilled work. (*Id.*)

      C.     The Administrative Hearings

         1.     The March 25, 2009 Administrative Hearing

At the March 25, 2009 administrative hearing, Plaintiff appeared with her attorney and testified. (Tr. 26-69.) She said that she lived with her husband and three children, aged 16, 12, and 9 years old. (Tr. 30-31.) She said she had a bachelor's degree in health science and that she still had a driver's license and drove around town, although she had not driven to the hearing. (Tr. 31.) She testified that she last worked in November of 2007, when she was working for the Department of Social Services ("DSS"), where she had worked since 2000 as a human services specialist. Her job entailed sitting most of the day, interviewing individuals, talking on the telephone, pulling files, filing cases, processing Medicaid applications, and lifting approximately 10-15 pounds. (Tr. 32-33.) Plaintiff said she began feeling pressure and anxiety at her job for several months before she left it in November of 2007. She said that the last day she was there, she remembered interviewing people and talking on the telephone and feeling very pressured, and she said she then went into the file room and blacked out. (Tr. 33-34.) Plaintiff said she filed a workers' compensation case, but was denied benefits. (Tr. 34.) She said she began drawing disability benefits of $648.12 per month from her retirement plan with the state of South Carolina. (Tr. 34-35.)[3]

---

[3] As the ALJ correctly noted, the standards for disability under the South Carolina Retirement System and under the Social Security Administration are different. *See* Tr. 23.

Plaintiff testified that, prior to working with DSS, she worked as a quality assurance technician. That job involved inspecting poultry and required walking around the plant all day in cold and wet conditions. (Tr. 35.) She said she had to lift tubs of poultry that weighed between 20 and 25 pounds. (Tr. 35-36.) Plaintiff also said that, while in high school in 1993, she worked part-time doing housekeeping in hotels. (Tr. 36-37.)

Plaintiff identified Dr. Barrow and Dr. Lowder as her treating sources. She indicated Dr. Lowder treated her for pain, including joint pain and tennis elbow, and for problems with bad veins in her legs. (Tr. 37.) She said her varicose veins caused swelling in her legs that compression hose eased. (Tr. 38.) She said she was supposed to wear the compression hose all of the time, but that they had burned in a recent house fire. She stated that when she stood for approximately 20 minutes, the swelling in her legs would increase and she would experience pain in her legs. She also said her legs would cramp if she sat for more than 25-to-30 minutes. (Tr. 38-39.)

Plaintiff said she had experienced pain in her elbows for a long time, and that Dr. Lowder gave her cortisone shots in both elbows every three-to-four months when she could afford them. She testified that, over time, the shots permitted her to use her arms better, but that she still had shaking and weakness in her right hand when she lifting a pot of water or more than a five-pound bag of sugar. (Tr. 39-40.)

She said that, at one time, she thought she had carpal tunnel syndrome in her right wrist and that she wore a brace on her right hand for a long time. She said she continued to have a constant aching, numb-feeling pain in her right wrist and hand. (Tr. 41.) She said she could use her elbows but that she had constant pain in them and that her right elbow sometimes locked up. She takes Naproxen for pain when she could afford it, and, when she

could not afford the prescription price, she took Aleve or Ibuprofen twice daily for pain. (Tr. 41-42.)

Plaintiff testified that she experienced pain in her knees, low back, neck, head, and shoulders, for which she also took Naproxen, Aleve, or Ibuprofen. (Tr. 42.) She said she did not know what caused that pain. (Tr. 42-43.) Plaintiff testified that her joint pain caused her to have problems with dressing, washing her hair, and washing and braiding her daughters' hair. (Tr. 43.)

Plaintiff also described having stomach pains caused by gastritis and reflux. She said she took Aciphex for gastritis, but that she lost it in her house fire and had been taking Zantac. (Tr. 43-45.) Plaintiff said she also had chest pains several times weekly, which the doctor told her could be caused by panic attacks. (Tr. 45-46.)

Plaintiff testified that she had bipolar disorder, which caused her to feel depressed and to have little energy. She said she took Risperdal for depression, but that she had run out of it. (Tr. 46.) She further testified that she heard voices and noises and could not sleep. (Tr. 47.) She said that, about four times per week, she would get angry and go into out-of-control rages, but she did not know if they were caused by her being bipolar. (*Id.*) Plaintiff also testified that she had engaged in impulsive behavior, such as having had sex with someone the year before, although she had been faithful to her husband for 17 years. (Tr. 48.) She said she had crying spells daily. (Tr. 48-49.)

Plaintiff said she stayed at home during the day and read. She said she read the Bible, mostly, and that she could only concentrate on reading approximately ten minutes at a time. (Tr. 49-50.) Plaintiff said she was able to do some housework, including loading the

dishwasher and washing clothes. (Tr. 51-52.) She said she cooked simple meals about twice per week, but that her husband had to assist her in opening cans. (Tr. 52-53.)

Plaintiff said she was often tired during the week, and that she took iron tablets for anemia. (Tr. 53.) Plaintiff said she complained to Dr. Lowder of never feeling rested and that he prescribed sleeping medication. (Tr. 54.) She said that, about three times per week, she laid down during the day because she was tired. (*Id.*) Plaintiff also said she had headaches approximately twice per week, for which she took ibuprofen. (Tr. 55.) She said that at one time Dr. Lowder told her she was having migraine headaches. (Tr. 56.) Plaintiff also said she could not deal with crowds because of the voices she heard. (*Id.*) She said she had dizzy spells approximately twice per day, which caused her to stumble if walking when they occurred. (Tr. 57.)

Plaintiff said she saw Dr. Lowder monthly or bi-monthly and saw Dr. Barrows every month when she could afford it. (Tr. 58.) She testified that her hallucinations began in 2007, and that they occurred several times weekly. (Tr. 58-59.)

Plaintiff stated that her activities included performing self-care, preparing at least simple meals, making beds, reading, washing dishes, doing laundry, using a computer (every one or two months), shopping, pumping gas, driving her children to the bus stop, spending time with family, and attending church (twice a month). (Tr. 64-65, 67.) She said she used to ride a motorcycle, bicycle, and fish, but that she had not done those things "in a long time." (Tr. 66.)

At the end of the March 25, 2009 hearing, the ALJ ordered Plaintiff have an internal and psychological examination before taking vocational evidence. (Tr. 68.) As detailed above, Plaintiff was evaluated by Douglas Ritz, Ph.D. and Eric Byrd, M.D.

b.    The August 21, 2009 Administrative Hearing

Plaintiff and her attorney appeared at a subsequent administrative hearing on August 21, 2009, at which VE Fifi Jabron and ME Milton Friedman testified. (Tr. 70-106.)

In response to the ALJ's questions, the VE testified that Plaintiff's PRW as a housekeeper was light, unskilled with a Specific Vocational Preparation (SVP) of 2, and the Dictionary of Occupational Titles (DOT) code for this job was 323.684-018. Plaintiff's PRW as a human services specialist was sedentary and skilled with an SVP of 7, and the DOT code for this job is 169.262-010. Her PRW as a quality checker in a chicken plant was light and semiskilled with an SVP of 4 and a DOT code of 529.387-030. (Tr. 87.)

VE Jabron then testified in response to a series of hypothetical questions, one of which concerned an individual of Plaintiff's age, education, and vocational background who could lift 20 pounds occasionally and 10 pounds frequently; sit for a total of six hours and stand and walk for a total of two hours in an eight-hour day; walk without an assistive device; push or pull up to 20 pounds; occasionally climb, balance, stoop, kneel, crouch, and crawl; never climb ropes, ladders, or scaffolds; reach, handle, finger, and feel without limitation; never work around heights or dangerous moving machinery; attend to and perform simple tasks without special supervision; attend work regularly (missing an occasional day); relate appropriately to supervisors and co-workers (but may find work with the general public stressful); make simple work-related decisions and occupational adjustments; adhere to basic standards of hygiene and behavior; protect herself from normal workplace safety hazards; and use public transportation. (Tr. 88-89, 91.) The expert testified that the hypothetical individual could not perform Plaintiff's past work, but could perform other work that exists in significant numbers in the national economy, including the unskilled light jobs

16

of office helper (DOT 239.567-010, 35,980 jobs in South Carolina and 2,560,000 nationally), machine tender (DOT 556.685-038, 14,300 jobs in South Carolina and 1,289,000 nationally), and routing clerk (DOT 222.687-022, 2,700 jobs in South Carolina and 200,000 nationally). (Tr. 89, 92.) The expert testified that her testimony about sitting and walking requirements was based on her professional experience. (Tr. 92.)

     ME Friedman also testified at the August 2009 hearing after having reviewed Plaintiff's medical records concerning her physical impairments. (Tr. 73-78.) He testified that Plaintiff's blood work indicated moderate iron-deficiency anemia, stating that she might experience some fatigue, but that he would not expect significant symptoms. (Tr. 77, 79-80, 82-83.) ME Friedman also noted evidence of tendonitis, tennis elbow, dizzy spells, fibromyalgia, polyarthralgias, migraine headaches, and obesity. (Tr. 74, 75, 80.) Based on his review of the records, ME Friedman opined that Plaintiff's physical impairments did not meet or medically equal a Listing. (Tr. 80.) He noted that he had not considered whether her mental impairments met or equaled a relevant Listing because that was out of his area of expertise. (Tr. 84-85.) He opined that, despite her combined physical impairments, Plaintiff retained the ability to perform light work, including lifting and carrying 20 pounds occasionally and 10 pounds frequently; sitting, standing, and walking six hours in an eight-hour day with normal breaks; and walking without a cane. He opined that she would not have any limitations in the use of her hands or feet; could occasionally perform postural activities such as climbing, balancing, stooping, kneeling, crouching, and crawling; could never climb ladders or scaffolds; and should avoid concentrated exposure to hazards. (Tr. 81-82.)

II.    Discussion

    A.    The ALJ's Findings

In his September 11, 2009 decision, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.

2. The claimant has not engaged in substantial gainful activity since November 29, 2007, the alleged onset date (20 CFR 404.1571 et seq.).

3. The claimant has the following severe impairments: polyarthralgias, fibromyalgia, right forearm tendonitis, right lateral epicondylitis, obesity, vertigo, depression, bipolar disorder, anxiety, and panic disorder (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity of frequently lifting and/or carrying up to 10 pounds and occasionally lifting and/or carrying no more than 20 pounds; involving sitting at least six hours a day; and involving a certain amount of walking or standing, with a maximum of two hours a day; without the need for an assistive device; with pushing or pulling limited to 20 pounds; with occasional climbing, balancing, stooping, kneeling, crouching and crawling; with no limitations in reaching, handling, fingering and feeling; with no climbing of ropes, ladders or scaffolds; with avoidance of heights and dangerous, moving machinery; with the ability to attend to and perform simple tasks without special supervision; with the ability to attend work regularly, but may miss an occasional day due to her mental condition; with the ability to relate appropriately to supervisors and coworkers, but may find work with the general public stressful; with the ability to make simple work-related decisions and occupational adjustments; with the ability to adhere to basic standards for hygiene and behavior; with the ability to protect herself from normal work-place safety hazards; and with the ability to use public transportation.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on January 1, 1973, and was 34 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from November 29, 2007, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 15-24.)

  B.  Legal Framework

    1.  The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets

or equals an impairment included in the Listings;[1] (4) whether such impairment prevents claimant from performing PRW; and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520.   These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis.   If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy.   To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can

---

[1]The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146, n.5 (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of

the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

C.    Analysis

Plaintiff argues that the ALJ erred in the following ways: (1) by failing to consider her impairments, including obesity, in combination; (2) by failing to find she met or medically equaled the requirements of Listed Impairment 12.04; (3) by giving inappropriate weight to the opinion of consulting physician, Dr. Byrd, and giving no weight to the opinion of her treating psychiatrist, Dr. Barrow; (4) by improperly evaluating Plaintiff's claimed disabling pain; and (6) by improperly relying on VE testimony. The Commissioner counters that the ALJ's decision is supported by substantial evidence and contains no harmful legal error.

1.    The ALJ Did Not Adequately Consider Plaintiff's Impairments, Including Obesity, in Combination

Plaintiff first argues that the ALJ erred by failing to consider Plaintiff's combined impairments, particularly chronic anemia, migraine headaches, fatigue, insomnia, and obesity. (Pl.'s Br. 24-25.) The Commissioner counters that the ALJ appropriately considered all of Plaintiff's impairments in combination, including those referenced by Plaintiff.

In determining whether Plaintiff is disabled, the ALJ must consider the combined effect of Plaintiff's severe and nonsevere medically determinable impairments in determining the claimant's disability status. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Even if the claimant's impairment or impairments in and of themselves are not "Listed impairments" that are considered disabling per se, the Commissioner must also "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B);

22

*see also Walker*, 889 F.2d at 50 (finding the ALJ must "consider the combined effect of a claimant's impairments and not fragmentize them."). "As a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." 889 F.2d at 50.

In addition, when considering a claimant's obesity. SSR 02-01p provides, in pertinent part, as follows:

> * * *
>
> **Obesity can cause limitation of function**. The functions likely to be limited depend on many factors, including where the excess weight is carried. An individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling. It may also affect ability to do postural functions, such as climbing, balance, stooping, and crouching. The ability to manipulate may be affected by the presence of adipose (fatty) tissue in the hands and fingers. The ability to tolerate extreme heat, humidity, or hazards may also be affected.
>
> * * *
>
> **In cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity**. . . .
>
> The combined effects of obesity with other impairments may be greater than might be expected without obesity. For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone.
> . . .
> **As with any other impairment, we will explain how we reached our conclusions on whether obesity caused any physical or mental limitations**.

SSR 02-1p, 2002 WL 34686281, *6-7 (emphasis added).

Plaintiff submits that the ALJ improperly found her chronic anemia and migraine headaches were nonsevere impairments and that he referenced her fatigue only in linking it to anemia. (Pl.'s Br. 24, citing Tr. 22.) Plaintiff further notes that, although the ALJ found obesity to be one of her severe impairments, he did not discuss the impact it had on her ability to perform work-related functions, in violation of SSR 02-1p. (Pl.'s Br. 24, citing Tr.

19 (in which ALJ indicates he will discuss Plaintiff's obesity "below," although he does not do so).)

The Commissioner argues that the ALJ adequately considered the combined effect of Plaintiff's impairments because he stated in his decision that his finding regarding Plaintiff's RFC was based on his "consideration of the entire record" (Tr. 17), and that he had considered "all symptoms" (Tr. 18). (Def.'s Br. 23.) Further, he submits that the ALJ adequately considered Plaintiff's anemia, fatigue, insomnia, and obesity because he referenced each of those impairments in his RFC analysis. (Def.'s Br. 23-24, citing Tr. 18-22.) He does not address Plaintiff's argument that the ALJ did not comport with SSR 02-1p's requirements.

In finding that Plaintiff's anemia was a nonsevere impairment, the ALJ referenced medical evidence of Plaintiff's history of chronic anemia, but noted that Dr. Lowder prescribed iron for the condition and that Plaintiff had worked for years with that condition. (Tr. 22.) He further noted that Plaintiff had made few complaints of fatigue (*id.*), presumably considering fatigue the symptom of her anemia. Further, the ALJ noted that ME Friedman testified at the hearing that he would not expect significant symptoms from Plaintiff's anemia (Tr. 17).

In finding Plaintiff's migraine headaches a nonsevere impairment, the ALJ noted that, although Plaintiff had been treated for migraines, that treatment had been infrequent. (Tr. 17.) He also noted that a November 2007 CT of Plaintiff's head was "essentially normal." *Id.*

Plaintiff also argues that the ALJ "ignored the effect of Plaintiff's obesity and fatigue." (Pl.'s Br. 24.) The Commissioner counters that the ALJ adequately considered Plaintiff's obesity and fatigue by "explicitly referenc[ing]" them in his decision. (Def.'s Br.

23-24, citing Tr. 18-19, 22.) The Commissioner does not discuss Plaintiff's argument that the ALJ did not satisfy SSR 02-1p's requirements.

The undersigned finds that the ALJ's evaluation of Plaintiff's anemia and migraines as nonsevere is supported by substantial evidence. Further, the undersigned finds that the ALJ appropriately considered Plaintiff's complaints of fatigue as symptoms related to her claimed anemia.

The analysis does not end here, however. The undersigned does not agree with the Commissioner's argument that the ALJ adequately considered all of Plaintiff's impairments, including obesity, in combination. *Walker*, 889 F.2d at 50, and SSR 02-1p require that the Commissioner: (a) consider Plaintiff's severe and nonsevere, medically determinable impairments—specifically including obesity—in combination; and (b) explain his consideration and findings regarding the combined impairments in a manner that permits the court to review those findings on appeal.

Here, the ALJ found that Plaintiff had multiple severe impairments, including obesity. (Tr. 15.) Although he references Plaintiff's obesity as one of her claimed impairments, his only discussion of any sort regarding her obesity follows:

> I find that due to her musculoskeletal impairments, including polyarthralgias, fibromyalgia, right forearm tendonitis, right lateral epicondylitis, **and obesity, which will be discussed below**, the claimant is limited in the amount that she can lift and carry; sit, stand and walk; and she has postural limitations.

(Tr. 19 (emphasis added).) The ALJ does not discuss Plaintiff's obesity further "below" or elsewhere in his decision. Further, nowhere in his decision does he discuss Plaintiff's obesity's impact on her physical or mental abilities, nor does he explain what impact, if any, obesity may have had on whether Plaintiff met or medically equaled one of the Listed impairments at Step 3 of the sequential analysis.

Further, the ALJ did not adequately consider and discuss any combined impact of Plaintiff's several severe and nonsevere impairments, in violation of Fourth Circuit precedent. When, as here, there are multiple impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's 'ability to engage in substantial gainful activity.'" *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974). The ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. *Id.* The cumulative or synergistic effect of the various impairments on the claimant's ability to work must be analyzed. *DeLoatche v. Heckler,* 715 F.2d 148,150 (4th Cir. 1983). In-turn consideration of multiple impairments is insufficient, as illustrated by the Fourth Circuit's finding in *Walker* that, although the ALJ "discussed each of claimant's impairments[, he] failed to analyze the cumulative effect the impairments had on the claimant's ability to work." 889 F.2d at 50.

The Commissioner argues that the ALJ's reference to considering "all" symptoms and "the entire record." In support, he cites only an out-of-circuit case for the proposition that the court should accept the ALJ "at [his] word" that he considered all impairments in combination because he said he considered "all" symptoms and the whole record. (Def.'s Br. 23 (*citing Flatery v. Astrue*, 515 F.3d 1067, 1071 (10th Cir. 2008) for "noting a general practice of taking a lower tribunal at its word when it declares it has considered a matter").)

The undersigned disagrees. As an initial matter, even if such boilerplate verbiage could suffice to demonstrate the ALJ considered all of Plaintiff's impairments, it does not purport to indicate he considered all impairments in combination. Further, the Fourth Circuit requires more. In *Walker*, the Fourth Circuit remanded plaintiff's claim because the ALJ

failed to adequately consider and explain his evaluation of the combined effects of the claimant's impairments. *See Walker*, 889 F.2d at 49-50. The ALJ found that the claimant suffered from several ailments and noted the effect or non-effect of each impairment separately. *See id.* The ALJ found that "the claimant did not have an impairment or combination of impairments listed in, or medically equal to, one listed in Appendix 1, Subpart P, Reg. No. 4." *Walker*, 889 F.2d at 49; *cf.* Tr. 15, Finding 4 (the ALJ using the same boilerplate language). The Fourth Circuit held that the ALJ in that case had failed to adequately consider and explain his finding because he did not analyze or explain his evaluation of the cumulative effect of the claimant's impairments. *See id.* at 49-50.

Similarly, the ALJ in this action failed to adequately explain his evaluation of the combined effects of Plaintiff's impairments, particularly with respect to his determination of whether the Plaintiff's impairments or combination of impairments met a Listing. As in *Walker*, the ALJ in this action found that Plaintiff suffers from several severe impairments, including obesity. (Tr. 15.) The ALJ also found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*See id.*) The ALJ considered whether Plaintiff satisfied one of the 12.00 Listings (concerning mental impairments) and discussed the testimony and opinion of ME Friedman in finding Plaintiff did not satisfy one of the Listings regarding physical impairments. (Tr. 15-16.)

However, nowhere in his decision does he discuss his consideration of the cumulative effect of Plaintiff's physical and mental impairments. The record contains references of the potential inter-relation of some of Plaintiff's physical complaints to her mental impairments, making the ALJ's function of closely examining her physical and mental impairments in

combination crucial to a determination of whether Plaintiff met or medically equaled any of the Listed impairments, as well as in the latter steps of the sequential analysis, should examination of those steps be necessary.

For example, when Plaintiff went to the ER on November 29, 2007, she told the attending physician that her symptoms of chest pain, anxiety, dizziness, and shortness of breath happened almost daily when she was at work, but that they had not happened when at home. (Tr. 298.) ER department notes focused on Plaintiff's physical complaints of chest pain and did not discuss whether they could have been related to any mental impairments, although the "Clinical Impressions" portion of those notes listed chest pain, syncope (fainting/dizziness), and anxiety as Plaintiff's diagnoses. (*Id.*)

In January 2008, Dr. Lowder referred Plaintiff to psychiatrist Dr. Barrow at the suggestion of her mental health counselor. (*See* Tr. 520-25, 540.) On February 29, 2008, Plaintiff told her treating physician Dr. Lowder that she was experiencing chest pains while waiting to see him. (Tr. 438.) Dr. Lowder's impression was that her chest pains were secondary to her anxiety. (*Id.*)

On April 3, 2008, rheumatologist Dr. Edwards examined Plaintiff and concluded she had "chronic pain—multifactorial [with] severe emotional issue." (Tr. 500.)

In May 2009, at Plaintiff's first visit to psychologist Dr. Ritz for the ALJ-ordered consultative evaluation, Plaintiff discontinued the evaluation because she began experiencing chest pains. (Tr. 595.) She did not return for the next scheduled appointment because she had been admitted to in-patient psychiatric care. (Tr. 595, 601-04.)

Further, at the second hearing, in opining Plaintiff did not meet or medically equal a Listed impairment, ME Friedman testified that he had not considered Plaintiff's mental

impairments, although he indicated that one of Plaintiff's health-care providers[4] had "noted that he felt that a lot of [Plaintiff's] problem was related to emotional problems." (Tr. 84-85.)

In discussing and adopting ME Friedman's conclusion that Plaintiff did not satisfy one of the physical Listings, the ALJ expressly noted that ME Friedman had not considered any mental Listings. (Tr. 16.) The ALJ found Plaintiff's multiple severe impairments included the physical impairments of vertigo and the mental impairments of bipolar, anxiety, and panic disorders. (Tr. 15.) He also discussed her medically documented history of hypertension and chest pain, although he did not identify those as related to a severe impairment. (Tr. 22.)

Despite the record evidence that discusses at least some connection between Plaintiff's physical and mental impairments, the ALJ did not discuss them in combination. In this recommendation, the court does not presume, nor intend to imply, that it can make medical determinations that there is a specific combination of Plaintiff's various impairments that indicates a finding that Plaintiff meets or medically equals a Listed impairment or otherwise is entitled to DIB. However, this record evidence, considered in tandem with the ALJ's failure to consider—or, at least his failure to explain his consideration of—Plaintiff's physical and mental impairments in combination, does not permit the undersigned to recommend a finding that the ALJ's determination is based on substantial evidence. Accordingly, Plaintiff's claim should be remanded to the Commissioner for proper explanation of the ALJ's evaluation of the combined effect of Plaintiff's impairments, severe and nonsevere, including obesity. *See Walker*, 889 F.2d at 50; *see also Alonzeau v. Astrue*, C/A No. 0:06-2926-MBS, 2008 WL 313786 (remanded because ALJ did not discuss

---

[4] The hearing transcript begins ME Friedman's statement in mid-sentence, making it unclear to whom he was referring. Tr. at 84; *cf.* Tr. at 50 (rheumatologist Dr. Edwards' note regarding Plaintiff's "chronic pain . . . [with] severe emotional issues").

consideration of claimant's impairments in combination in determining whether claimant met or medically equaled a Listed impairment).

### 2.    Plaintiff's Remaining Allegations

Plaintiff also argues that the ALJ erred by failing to find she met or medically equaled Listing 12.04 and that he failed to adequately consider the opinion of her treating psychiatrist in so deciding. She also argues that the ALJ improperly accepted ME Friedman's testimony rather than the opinion of examining consultative ME Byrd. She also argues that the ALJ improperly accepted the VE's testimony that there were jobs she could perform. (Pl.'s Br. 26-32.)

As discussed above, the undersigned recommends the ALJ be instructed to revisit his evaluation of Plaintiff's DIB claim, beginning with reconsidering whether Plaintiff's combined mental and physical impairments meet or medically equal a Listed impairment. These additional considerations will impact the ALJ's determination of whether Plaintiff meets a Listing as well as the subsequent steps of the sequential process. Therefore, the undersigned cannot now determine whether the ALJ's determination at Step 3 of the sequential evaluation is supported by substantial evidence. Further, the ALJ's consideration of the issues discussed above may render Plaintiff's remaining issues moot. *See Boone v. Barnhart*, 353 F.3d 203, 211 n.19 (3d Cir. 2003) (remanding on a particular ground and declining to address claimant's additional arguments). Accordingly, the undersigned does not consider Plaintiff's remaining allegations of error at this time.

### III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the

foregoing, the undersigned cannot determine that the Commissioner's finding is supported by substantial evidence or is without legal error.

Accordingly, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions, it is recommended that the Commissioner's decision be reversed and remanded for further administrative action as detailed within.

IT IS SO RECOMMENDED.

January 23, 2012                                      Kaymani D. West
Florence, South Carolina                             United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**